FRANK F. MESSER, Appellee, v. WASHINGTON NATIONAL
INSURANCE COMPANY, Appellant.

No. 46251.

NOVEMBER 16, 1943.

Dutcher, Ries & Dutcher, of Iowa City, for appellant.

Messer, Hamilton & Cahill, of Iowa City, for appellee.

MANTZ, J.— This is an action in equity wherein
Frank F. Messer, plaintiff, brought suit against the Washington
National Insurance Company, defendant, on a disability insur-
ance policy held by him in said company, claiming indemnity
thereunder, alleging, in substance, that on July 27, 1941, while
said policy was in force, he suffered an injury while riding a
horse; that said injury was to his abdomen and as a result thereof

plaintiff was taken to a hospital where he submitted to an abdominal operation on August 6, 1941, resulting in his total disability until October 1, 1941, and in partial disability thereafter until October 15, 1941; that plaintiff notified the defendant of said accident and filed proofs; that about November 10, 1941, an authorized representative of the company called upon plaintiff, admitted its liability under the policy, and represented, stated, and showed plaintiff that the policy provided $100 per month for total disability, $50 per month for partial disability, and $100 for an abdominal operation, and then and there stated, represented, and showed plaintiff that under the terms of Section VI of said policy plaintiff was entitled to $100 for total disability for one month and $100 for the abdominal operation, a total due under the policy of $200.

Plaintiff alleges that he was then unaware of the fact that because of his paying double premiums all benefits under the policy were to be doubled, and that under the admission and interpretation of defendant, plaintiff was entitled to receive $400 instead of $200; that relying on defendant's representations, statements, and acts aforesaid, and due to mutual mistake and oversight on the part of plaintiff and defendant, or due to such mistake and oversight of plaintiff, and an intent to conceal, cheat, and defraud on the part of defendant, plaintiff accepted a $200 check and signed a receipt and some kind of a release for the defendant; that upon discovery by plaintiff of the true facts he made demand upon the defendant for the additional $200 in accordance with the terms of the policy but that defendant refused, basing its action on the ground that plaintiff had cashed the check and signed a release and receipt; that later plaintiff discovered that under the policy there was due and owing him $736.50.

Plaintiff further alleges that by the statements, acts, and conduct as alleged, and by other false and fraudulent statements, the defendant attempted to dispose of said claim by the payment of $200 instead of the amount actually due and to obtain a receipt and release thereof; that all was part of a plan and scheme to cheat and defraud plaintiff; that on account thereof the said plaintiff is entitled to a decree rescinding said transaction and setting aside any receipts or releases executed and to judgment

for $736.50 with interest, allowing defendant a credit on such sum for the $200 already paid, and for such other relief as may be just and equitable in the premises.

Defendant answered that on July 27, 1941, plaintiff was the holder of a policy of accident insurance in its company and that during September of that year plaintiff made demand upon defendant for benefits under the policy on account of an accident on July 27, 1941; that subsequent thereto defendant caused an investigation to be made of said accident and claimed disability and operation resulting therefrom, and, pursuant to said investigation, determined that the claimed disability and operation performed upon plaintiff were not caused solely and directly by accidental means within the terms of the policy; that about November 10th, a duly authorized representative of defendant company, acting in good faith upon information and belief that the claimed disability and operation upon plaintiff were not caused solely and directly by accidental means but, on the contrary, were complicated by disease having no connection with the accident of July 27, 1941, denied any liability on the part of defendant for benefits as claimed by plaintiff.

Defendant further alleged that after first making demand upon the insurance company in September 1941, and up to and including November 10, 1941, the plaintiff was claiming a sum in excess of $200 as being due him under said policy and at the time of the payment to plaintiff by defendant of the sum of $200 there was a dispute between plaintiff and defendant as to the amount due under the terms of said policy, and that the sum of $200 paid to plaintiff on November 10, 1941, was paid as consideration for full and complete settlement of a claim the amount of which defendant in good faith denied.

The defendant alleged that when the $200 was paid on November 10, 1941, as full consideration therefor, plaintiff executed and delivered to defendant a release in full of all claims, demands, and causes of action under said policy, and alleged that said release and the payment of the $200 as consideration therefor released all claims and demands of the plaintiff on account of injuries claimed to have been suffered by him on July 27, 1941. A copy of said release was attached to defendant's answer and de-

fendant prayed that the claim of plaintiff be dismissed and judgment for costs be rendered against him.

The lower court found in favor of plaintiff, ordering that the release given by plaintiff to defendant on November 10, 1941, should be rescinded, canceled, set aside, and held for naught, and plaintiff was given judgment against defendant for $716.66 less a credit of $200 with five per cent interest from the date of judgment. Defendant has appealed.

Some of the facts are not in dispute; in others, there is a sharp conflict. We think the record fully sustains the following:

That on July 27, 1941, appellee was the holder of what is termed a "non-cancellable disability policy" issued by the Great Western Insurance Company (later assumed by defendant), which was then in full force and effect, and that by reason of the payment of double premiums appellee was entitled to double indemnities under the terms thereof; that the appellee, while in California, consulted a physician concerning his condition; that upon the advice of such physician he was taken to the Murphy Memorial Hospital at Whittier, California, on August 5th, and August 6th he was operated upon for an acute abscess, an abdominal incision being made; that he remained in the hospital until September 1st and remained at Whittier until September 14th or 15th, receiving regular medical attention, after which he returned to his home in Iowa City and was treated there until the wound had fully healed. He was unable to work until about October 1st, and then worked part time until October 15th, following which he worked full time. About September 17th, he wrote to appellant advising it of his injury and disability, and, upon request of appellant, on September 30th sent to appellant a personal report of his claim and on October 4th he sent a further statement in which he enclosed a statement of his attending physician and a report from the hospital. The appellant acknowledged receipt of said claim and the attached statements and advised appellee that an investigation of his claim was being made.

It further appears that on the personal report of appellee there was the following question:

"What would you consider a fair settlement if made immediately and without further reports"?

To this question, in his own handwriting, appellee made the following answer:

"Offer of settlement on letter attached and subject to conditions stated. $275—$100 operation fee as per policy and $175 benefits."

The letter referred to in the above answer was dated September 30th and in it appellee refers to the offer of settlement of $275 and states that he considers it to be fair and would accept it if paid immediately and without further reports. On October 2d appellant acknowledged receipt of appellee's letter and the personal report relative to the appellee's claim, and in such letter there is the following:

"* * * we note with interest your proposal of settlement in the amount of $275.00."

In this letter appellee was advised that appellant was unable to render a decision concerning its liability under the policy without the benefit of fully completed proofs, and asked for the report of the attending physician and also one from the other attending physician, and a report from the hospital. This letter concluded with the following:

"If you will send in fully completed proofs on blank furnished for that purpose by the Company, the matter of adjustment in accordance with your proposal will be given prompt attention in accordance with the facts and provisions of the policy."

On October 4th appellee wrote appellant enclosing a statement of the attending physician and that of the hospital, and advising that he was unable to secure the statement of the other attending physician on account of his absence. On October 9th Schaffnit, assistant manager of appellant company, acknowledged receipt of the letter with the reports of the physician and the hospital and further stated that the company was endeavoring to complete the investigation with the least possible delay and hoped to be able to inform him concerning the acceptance of the proposal within a relatively short period of time.

It appears without dispute that on November 10, 1941,

Assistant Manager Schaffnit, representative of appellant, called at the office of appellee in Iowa City, Iowa, for the purpose of talking to appellee about the claim appellee was making against the insurance company. The evidence is in conflict as to some of the things which took place at that time. It does show, however, that after some discussion, Schaffnit gave to appellee, on behalf of the company, a check for $200, and that, as a part of the same transaction, the appellee executed and delivered to Schaffnit a paper entitled ''release,'' which recited in substance that it was given in return for a consideration of $200 paid and was a settlement and discharge of all claims, demands, and causes of action which appellee had or claimed to have against appellant under said policy. This check was cashed by the appellee on November 13th by a deposit of its proceeds to his account.

On November 24, 1941, appellee wrote appellant concerning the transaction of November 10th, stating that due to mutual mistake and oversight he had been paid $200, but that under the terms of said policy he was entitled to $400 due to the fact that the policy carried double benefits, and requesting that the company send him a check for the additional $200. Replying to this letter, the company refused to make further payment, claiming a compromise and settlement and stating that appellee had been paid all that was due him under the policy. Following some further correspondence concerning the matter, this action was brought.

Both parties herein have directed their principal arguments to the force and effect of the transaction between the parties on November 10, 1941, at the office of the appellee at Iowa City, Iowa. A large part of the evidence in the lower court and the arguments on this appeal are directed to that transaction. In essence, it is the claim of the appellee that at that time there was a mutual mistake or oversight between the parties as to the liability of appellant and the amount due appellee under the terms of the policy because of the accident of July 27, 1941; also that at said time appellee was unaware of the double-indemnity feature of the policy and that this was well known to the representative of appellant company; further, that the representations of the appellant's agent and his conduct deceived and misled

the appellee to such an extent that he was defrauded in that he accepted the $200 check and signed the release.

On the other hand, appellant claims that the transaction of November 10, 1941, was a compromise and settlement of a disputed claim; that the dispute was in good faith and that the appellant had honest and reasonable doubts, based upon investigation, that it was liable to the appellee under the claim urged. Other questions are argued but we think that the one above set forth is controlling.

The policy sued upon was for disability benefits arising out of accidental causes and in it the insurance company promised to pay certain indemnities growing out of personal injuries caused solely and directly by accidental means. The burden was upon the claimant appellee to establish his right to recover under the terms of the policy.

The appellee having made a claim thereunder and having furnished the information requested, and later the parties having met and entered into a purported settlement wherein the appellant company paid appellee $200 and at the same time appellee executed and delivered to appellant a paper purporting to be a release, the burden rests upon appellee to furnish evidence sufficient to warrant the court to set aside said release. If the appellee shows that said release should be set aside, he still has the burden of establishing his claim to indemnity under the policy.

Appellee is fifty-four years of age and has been engaged in the active practice of law at Iowa City, Iowa, for many years; he received the policy involved herein in 1935 and there was no evidence that it had been changed since issued; at all times since issued it has been in his possession, and at the time of the transaction of November 10th it was handled and referred to in the discussions between appellee and Mr. Schaffnit; appellee personally handled all matters in connection with his claim.

The check for $200 which appellee received on November 10th, and which was deposited to his account on November 13th, reads as follows:

"DEPT.....................DIST.................................Nov. 10, 1941........

FILE NO. 326326

WASHINGTON NATIONAL INSURANCE COMPANY

Pay To The Order of...............Frank F. Messer............... $200.00
Two Hundred & no/100........................................................DOLLARS

In Settlement of Claims as Per Receipt on Reverse Side.

To  WASHINGTON NATIONAL

    INSURANCE COMPANY              CLEAR

    CHICAGO, ILL.                    THRU

                              70-114

                              E. G. Schaffnit."

On the reverse side of said check appears the following:

"Received of WASHINGTON NATIONAL INSURANCE COMPANY $200.00, in full payment, satisfaction, discharge and release of any and all claims that I myself, my heirs, executors, administrators, assigns or beneficiaries now have or may hereafter have against said Company under Policy No. 340981 arising on account of injuries received or illness contracted on or about the 27 day of July 1941 and any loss that may hereafter result from said injuries or illness.

                      for deposit to my account

                            Frank F. Messer

                                Signature."

This check was stamped "Paid" on November 13, 1941.

The release which appellee executed and delivered to appellant when he received the $200 check reads as follows:

"RELEASE

WASHINGTON NATIONAL INSURANCE COMPANY

CHICAGO, ILL.

WHEREAS, Frank F. Messer has made claim against the Washington National Insurance Company, claiming that he or she is entitled to benefits under Policy No. 340981; and,

WHEREAS, a difference has arisen between said party and the Washington National Insurance Company and there is now a dispute between the said parties concerning said claim.

Now, THEREFORE, in consideration of the sum of Two Hundred and no/100 dollars, this date paid to me by the Washington

National Insurance Company, I do hereby remise, release and forever discharge the said Company from all claims, demands and causes of actions at law or equity that I have or claim to have under said policy.

Said amount is accepted by me in full settlement and compromise of all claims of every character I have or claim to have against said Company by reason of said policy.

WITNESS my hand and seal this 10 day of Nov. 1941.

WITNESS:

E. G. Schaffnit                                        Frank F. Messer.''

Before proceeding to a consideration of the evidence, we think that it will be helpful to set forth some of the legal principles involved.

In 15 C. J. S. 728, 730, section 11, under the heading of ''Compromise and Settlement,'' the general rule is stated:

''The settlement of a disputed or doubtful claim asserted in good faith is a sufficient consideration for a compromise, even though such claim proves to be without merit, and an action thereon not sustainable.''

In 11 Am. Jur. 248, 249, sections 3, 4, the matter of compromise and settlement is dealt with at considerable length. The general rule as therein set forth is that a compromise is a contract, and, like other contracts, there is the necessity of proper parties capable of making and entering an agreement, the subject matter, and the consideration. It states that if the parties act in good faith, even where they know all the facts and there is a promise without legal liability on which to base it, the courts hesitate to disturb the agreements of the parties on any assumption that an advantage which they have obtained and conceive to be worth paying for is not valuable. The law favors the amicable settlement of controversies, and it is the duty of the courts rather to encourage than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims. The nature or extent of the rights of each should not be too nicely scrutinized. Courts should, and do, so far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties; the consideration for

such agreements is not only valuable, but highly meritorious. Further, such agreements are binding without regard to which party gets the best of the bargain or whether all the gain is in fact on one side and all the sacrifice on the other. It has been declared that to prevent the compromise of claims by compelling adjustments of all controversies by litigations in court is against public policy.

This court on many occasions has had before it the question of the effect of compromise and settlement. It is hardly necessary for us to say that such are favored by law, and our examination of cases from other jurisdictions reveals that our courts are in line with the great majority of such courts. We will examine and set forth a few of the Iowa cases dealing with this subject.

In Urdangen v. Fryer, 183 Iowa 39, 41, 166 N. W. 693, this court, speaking through Ladd, J., on the subject of compromise and settlement, said:

"If disputed claims are asserted in good faith, even though judicial investigation might have demonstrated them to have been unfounded in fact, the settlement thereof furnishes a sufficient consideration for the settlement agreement." (Citing Greenlee v. Mosnat, 116 Iowa 535, 90 N. W. 338.)

See, also, Salinger v. Glidden Farmers Elevator Co., 210 Iowa 668, 231 N. W. 366; Heflen v. Brown, 208 Iowa 325, 223 N. W. 763. In the case of First National Bank v. Browne, 199 Iowa 981, 984, 203 N. W. 277, 278, the court said:

"It is immaterial that a judicial investigation might demonstrate the claim to be unfounded in fact, if in fact the asserted claim is made in good faith."

This doctrine has the support of the following cases: Heffelfinger v. Hummel, 90 Iowa 311, 57 N. W. 872; Morey v. Laird, 108 Iowa 670, 77 N. W. 835; First State Bank v. Williams, 143 Iowa 177, 121 N. W. 702, 23 L. R. A., N. S., 1234, 136 Am. St. Rep. 759; Cantonwine v. Bosch Bros., 148 Iowa 496, 127 N. W. 657; Stuart v. White, 191 Iowa 1312, 184 N. W. 337; Graf v. Employers L. A. Corp., 190 Iowa 445, 180 N. W. 297; Urdangen v. Fryer, supra.

In the case of Partello v. White, 197 Iowa 24, 32, 196 N.

W. 719, 722, Vermilion, J., made a thorough review and analysis of the Iowa cases bearing upon that subject. In that case a father had made a deed of certain farm lands in Palo Alto County, Iowa, to a son. This deed was never recorded and following the death of the son it was found among his papers. His widow, sole beneficiary of his estate, took possession of the deed and claimed the land. A dispute arose between the widow and other heirs concerning the validity of the deed, the heirs claiming that, as there had been no delivery, it was ineffective to convey title. Following a conference of all interested parties it was agreed that if the widow would surrender the deed to the grantor the latter would make a codicil to his will devising the land in question to the widow. Following this agreement, and at that time, the grantor made such a codicil to his will, and thereupon the widow returned the deed to grantor. A week later the grantor made another codicil to his will in which he made a different disposition of the land described in the deed and codicil. Following the death of the grantor, the widow brought suit to obtain the land, claiming by virtue of the compromise agreement. The court allowed her claim and this court affirmed its holding.

The main contention of the appellants in that case was that, as the deed was invalid by reason of nondelivery, there was no consideration for the compromise-and-settlement agreement. We will quote briefly from the opinion:

"However, if the question of the delivery and validity of the deed were doubtful, still the settlement and compromise of plaintiff's claim thereunder would be a sufficient consideration for the promise of the father to devise the land to her. This is too well settled to admit of controversy. Richardson & B. Co. v. Independent District, 70 Iowa 573; Adams v. Morton, 37 Iowa 255; Mowbray v. Simons, 183 Iowa 1389; Carter v. Iowa S. B. M. Bldg. & Loan Assn., 135 Iowa 368; Heffelfinger v. Hummel, 90 Iowa 311; Cantonwine v. Bosch Bros., 148 Iowa 496; Jewett Lbr. Co. v. Conroy Co., 171 Iowa 513; Goodman Mfg. Co. v. Mammoth Vein Coal Co., 185 Iowa 253; Smith v. C. R. & M. R. Co., 43 Iowa 239. Nor must it necessarily be found, in an action upon the contract of settlement, that plaintiff's original claim was valid and enforcible. This would seem to be obvious

on the face of it. If a party seeking to recover upon or enforce a contract of settlement must, in order to prevail, establish the original right claimed by him, which he relinquished in the settlement, he has gained nothing by the compromise. Such a rule would defeat the very object of compromise, a thing favored by the law. * * * The obligations arising from the compromise and settlement of a disputed or doubtful claim are reciprocal. It is, indeed, the very doubt or question as to the enforcible character of a demand that lies at the root of a compromise. The agreement to accept less than the amount due on an unquestioned obligation is without consideration * * * There is no purpose to doubt the familiar rule that the compromise of an illegal demand, or one founded on an unlawful consideration, or one wholly unfounded, and tainted with bad faith, cannot be enforced. But the doctrine that, in order to recover upon or enforce an agreement of compromise, it is not necessary that the validity of the original claim be shown, is well settled by authority."

In concluding the discussion of that subject (compromise and settlement), the court said:

"Briefly stated, the conclusion is that the compromise of a doubtful right asserted in good faith is a sufficient consideration for a promise, and it is not material on which side the right is ultimately found to lie."

In support of the above, see Greenlee v. Mosnat, supra; Goodman Mfg. Co. v. Mammoth Vein Coal Co., 185 Iowa 253, 168 N. W. 912; Richardson & Boynton Co. v. Independent District, 70 Iowa 573, 31 N. W. 871; Smith v. Cedar Rapids & M. R. R. Co., 43 Iowa 239; Dickson v. Sioux City Terminal Ry. Co., 147 Iowa 601, 125 N. W. 167; Fairfax State Sav. Bk. v. Coligan, 211 Iowa 670, 234 N. W. 537; Coffman v. Brenton, 214 Iowa 185, 239 N. W. 9; Miles v. New Zealand Alford Est. Co., 32 Ch. Div. 266, 283. In this last-cited case it was said:

"* * * if there is in fact a serious claim honestly made, the abandonment of the claim is a good 'consideration' for a contract * * *."

1384

In Richardson & Boynton v. Independent District, supra, at page 576 of 70 Iowa, page 872 of 31 N. W., the court, in discussing the question of compromise and settlement, said:

"We need not consider the questions of law and fact thus raised, and determine which party is right. All that we need know is that there was a controversy between the parties, each claiming in good faith rights in itself, and liabilities against the other, wherefrom arose a subject of dispute capable of being settled and compromised. This was done by the second contract made by plaintiff's proposition and defendant's acceptance thereof. The law favors such settlements of controversies, and finds a consideration for the contract looking to the compromise in the mutual agreement of the parties to abide the result of the settlement."

In the case of Keck v. Hotel Owners Mut. F. Ins. Co., 89 Iowa 200, 56 N. W. 438, plaintiff brought suit to recover losses claimed under a fire policy. In that case, following some negotiations, the company sent plaintiff a draft for a lesser amount than she claimed to be due. She cashed the draft and later brought suit for a claimed balance. The defendant claimed that there had been a compromise of a matter in dispute and that, as the defendant had accepted the amount sent, this was consideration for the compromise. In that case the court held that the settlement of a disputed claim furnished sufficient consideration for the agreement and settlement. Many other cases might be cited but we think the foregoing sufficiently set forth the general rule.

With these general rules in mind let us examine the record. Was there a dispute between appellee and appellant as to the liability of the latter and the extent thereof, under the policy, on November 10, 1941? We think there was. Appellee had previously written appellant stating he considered $275 a fair settlement for his claim and that he was willing to accept same for that purpose. He now says that at the time he so wrote he did not have the policy before him and was then unaware that it carried double indemnity. He claims that the company at all times knew of this feature of the policy. As appellee at all times had possession of his policy, his opportunity to know this feature

was at least equal to that of appellant. The fact that following this offer appellant asked for a report of the attending physician and also of the hospital is persuasive evidence that it had doubts as to its liability. The report of the attending physician and that of the hospital showed that appellee had had at least one prior operation of a serious nature and that the incision of August 6, 1941, was in the track or path of a former operation. The operation was performed by Dr. Tebbetts, assisted by Dr. W. C. Bruff. There is no written report from Dr. Tebbetts. In the report sent in by Dr. Bruff, he was asked the following question:

"Did you observe any indication of an abscess of the right side of abdomen upon initial examination? A. Yes."

In answer to a question asking him to describe the operation, Dr. Bruff gave the following answer:

"The operation was a simple incision and drainage of the abscess."

Appellee likewise sent to appellant a report showing the record of the Murphy Memorial Hospital. This record showed that appellee had been at Rochester, Minnesota, and was there operated upon for gallstones, perforated bowel, and liver, followed by subdiaphragmatic abscess. The report, under the head of preoperative diagnosis, gave "gall bladder disease"; and under the head of postoperative diagnosis gave "reinfection of an old gall bladder drainage sinus." This report gave, as findings, "reinfection of an old gall bladder drainage sinus from a liver abscess in 1938." The operative record, as shown by such report, is as follows:

"Incision to the right of the old scar of the gall bladder operation and the abdomen opened up and found that an acute abscess was present in the old drainage sinus."

The appellant had underscored with red pencil the record of the preoperative and postoperative diagnoses, the findings, and that part of the operative record reading as follows: "* * * found that an acute abscess was present in the old drainage sinus."

While appellee argues that no particular importance can be attached to the hospital records, yet it is well known that these records are compiled by hospital employees and are for the most extent based upon information given by either the patient or the attending physicians. We find nothing in this record to cast doubt or question upon the hospital records in this case.

It is the claim of appellant that its liability, if any, under the policy is based upon what is known as Section VI of the policy, which section, so far as material, reads as follows:

"Section VI—BENEFITS FOR EXCEPTIONAL CASES.

"The Company's liability for any loss or for any disability under the following conditions shall be limited to an amount equal to one month's benefits, as provided in paragraph 1 of Section III * * *(d) if 'such injury' becomes complicated with or by disease."

Paragraph 1, Section III, reads as follows:

"1. TOTAL DISABILITY. When 'such injury' (other than as covered by Section VI) continuously and totally disables the Insured within thirty days from the date of the accident, the Company will pay at the rate of ONE HUNDRED DOLLARS ($100.00) per month for a period not exceeding two years for the number of consecutive days that the Insured is so totally disabled, if during such disability Insured is regularly treated by a licensed physician other than himself."

A further question presents itself. Was the appellant acting in good faith in its various dealings with appellee in regard to his claim for disability benefits? We find little in the record to indicate otherwise. Appellee claims that the appellant actively engaged in conduct amounting to bad faith and fraud, in leading appellee to believe that at most he was entitled to single indemnity when in truth and in fact he was entitled to double indemnity; that the representative actively concealed certain parts of the policy from appellee when exhibiting same; that said representative misled and misinformed appellee as to his rights in the matter. All of such claims are disputed by the representative of the company. There is little in this record to indicate fraud and

false dealings on the part of appellant with appellee. We must remember that fraud and fraudulent conduct are never presumed; they must be shown by affirmative evidence.

The appellee claims that on November 10, 1941, there was a mutual mistake or oversight between him and the representative of the company as to the amount due appellee under his policy. He further claims that the appellant admitted the liability thereunder. The parties had the policy with them during the discussion and it was handed back and forth and different parts thereof examined. Appellee does not deny that Schaffnit told him that if there was any liability on his claim it would be under Section VI of the policy, that being subdivision D, which states that if injury is complicated with or by disease the liability of the company (appellant) is limited to one month's benefits. Appellee further states that Schaffnit specifically called his attention to this particular provision and in the same connection pointed out to appellee from the report of the attending physician the statement that the abscess relieved by the operation occurred in an old drainage sinus, although trauma may have been the activating factor in causing reinfection. Appellee, as a witness, testified that Schaffnit mentioned that the injury had been complicated by other disease. On cross-examination he said:

"I didn't know what disease he was talking about. * * * I didn't ask him what disease. * * * I took his word for it."

In the same connection appellee testified that Schaffnit showed him the statement that the disease he was talking about, according to the hospital report and that of Dr. Bruff, had been complicated by and was a reinfection of an old gall-bladder sinus. The policy involved, the report of Dr. Bruff, and that of the Murphy Memorial Hospital, were before the parties. Schaffnit advised appellee that he did not think the company liable for the claim and suggested that if there was any liability thereunder it would be under Section VI of the policy, which provided that the total to be paid thereunder was one month's benefits, or $200, under the double-indemnity feature. He states that appellee did not act favorably to his suggestion as to such allowance but that after some discussion it was finally agreed that they would settle on that basis and following this a check for $200 was made out

and given to appellee, and that appellee at the same time and as a part of the same transaction executed a release and delivered the same to Schaffnit.

We do not find that the record sustains the claim of appellee that on November 10, 1941, when the $200 check was given him and he in turn executed to Schaffnit the release, there was a mistake or oversight of the parties. If there was any mistake it was not mutual. Schaffnit paid to appellee the benefits which he was entitled to receive under Section VI of the policy. Appellee has cited in his brief the case of Jordan v. Brady Transfer & Storage Co., 226 Iowa 137, 145, 284 N. W. 73, 77, and he claims that this case sustains his position. In that case there was an injury to the plaintiff, his arm being broken. There was a question as to the probable duration of the disability of the injured party. All the parties thereto, including the physician, were of the opinion that the period of disability would be about three months, and a compromise and settlement was entered into based upon that assumption. It developed that the disability continued for a longer period and the court permitted the plaintiff to sue for additional disability. This court upheld the lower court and on that issue, Bliss, J., said:

"In order to warrant the setting aside of a contract of settlement * * * because of mistake, it must be established that the mistake was a mistake of fact, and that it was a mutual mistake of both parties."

We think that the foregoing may be considered in connection with the point which appellee makes, to wit, that there was no dispute as to the liability of appellant on the claim which appellee was making. Prior to November 10, 1941, appellee had written appellant that he considered $275 a fair sum by way of settlement of his claim. In response appellant wrote:

"* * * we note with interest your proposal of settlement in the amount of $275.00."

However, at the same time appellant advised appellee to submit proofs by the attending physician and the hospital. The very fact that appellant did not accept appellee's offer to settle

for $275 would indicate that it was not satisfied as to its liability. We think the evidence given by appellee as to the conversation had between him and Schaffnit on November 10th, concerning the amount to which appellee was entitled, supports the claim of appellant that there was a dispute. The testimony of Schaffnit directly contradicts that of appellee and we think the whole record sustains the claim of appellant on that matter.

Did appellant have any doubts as to its liability to the appellee on the claim made by him? Appellee's claim was unliquidated. He claims that while he was riding horseback in New Mexico, while crossing a river his horse stumbled over a stone, throwing appellee against the pommel of the saddle, causing an injury to his side; that a few days following he drove to Whittier, California, and while there a tenderness and soreness developed in his side in the region where the blow was received. He consulted a physician on August 5th and was taken to Murphy Memorial Hospital of that city and on August 6, 1941, an operation was performed by Dr. Tebbetts, assisted by Dr. Bruff; the operation was in the side and an acute abscess was found and it was located in the path or track of a former operation. Dr. Bruff, in his report of the accident on October 2, 1941, refers to the history of the accident as given him by appellee. In this report made to appellee and by him sent to appellant, Dr. Bruff was asked the following question: "What, if any, visible marks of injury were there?" (Describe fully.) The answer as given by Dr. Bruff was: "Soreness and tenderness in right side [of] abdomen." On October 9, 1941, Dr. Bruff made a further report of his attendance on appellee. He stated therein, in reply to a question as to the location of the injury: "The contusion was to the right costal margin. At the time of my first examination he had already developed an abscess." He was asked to answer the following question: "Taking into consideration the history and your findings during treatment and surgery, what was the cause of the abscess? A. It occurred in an old drainage although trauma may have had an activating factor in causing reinfection." The hospital report shows that appellee had had prior operation for "gallstones—perforated bowel and liver operated 1938 at Mayos followed by subdiaphragmatic abscess—drained spontaneously."

Appellee had received these reports and sent them to appellant. When we examine the report of the appellee, the two reports sent in by Dr. Bruff, and the hospital records, and the circumstances in connection therewith, we are not prepared to say that appellant did not have doubts as to the claimed injury being the cause of the operation.

The interval elapsing between the claimed injury on July 27th and when appellee consulted a physician, the distance traveled by appellee between said dates, the location of said abscess, the former operation and the location thereof, the somewhat equivocal statement of the physician as to the cause of the abscess, might reasonably be calculated to cause doubts on the part of the appellant as to its liability for said injury. There is nothing in the record to indicate that appellant acted in bad faith or possessed a dishonest doubt as to the manner in which appellee's claim was handled. It is true appellee charges that there was studied and active fraud, as well as concealment, practiced upon him in inducing a settlement. Certainly there was nothing unusual about the manner of the handling of the claim on the part of appellant. It acted promptly when advised of the claim and requested the usual and customary proofs. Appellee argues that a representative of the company, with a schooling of twenty-three to twenty-four years in the art of approach, settlement, and adjustment of insurance cases—a specialist in such matters—came to his office claiming to be there pursuant to his duty to look after the welfare of the policyholders. He argues that as a lawyer, accustomed to dealing with honest people, he was an easy mark or prey to such a personage, and that the assurance that there was no dispute about the bona fides of appellee's claim constituted a sufficient hypodermic under which the knockout blow was later delivered. We feel that we may properly consider such arguments in the light of the evidence as to the attitude of appellee toward insurance companies, given by a partner, Mr. Cahill, who said that appellee had little faith in insurance companies, "and I do, so every chance he gets he pours it on me."

In this connection it should be kept in mind that appellee is an attorney of standing and ability and has been in the active practice of law for over a quarter of a century. He and the

representative of appellant were dealing at arm's length. He knew, or should have known, his rights under the policy, and the legal effects of his actions concerning his claim. While he had before him his contract, the various medical reports, all in plain and unmistakable terms, he gave as his excuse for some of his actions: "I did not read them; I took his word for it." As to the instrument which appellee signed on November 10, 1941, which clearly and plainly stated that it was a settlement and release of the claim appellee was making, he said in effect that he did not read it. On cross-examination the following question relating to such release was asked: "You notice the first word on the page there? A. I do now, it says 'release.' I never saw it before." The check for $200 which was paid him on November 10, 1941, which he deposited three days later, states on its face, "In settlement of claims as per receipt on reverse side." On the reverse side of the check appears a statement just above the endorsement line to the effect that the $200 was received in full payment, satisfaction, discharge, and release of any and all claims which appellee was making on the policy by reason of the injuries received on or about July 27, 1941. Just below such statement appears the written signature of appellee.

Summing up, it is our opinion that as to the claim which appellee made because of his injury the appellant acted in good faith in making investigation of the same; that was its duty; that on November 10, 1941, at the time the parties met in Iowa City, there was a good-faith dispute as to the liability of appellant under such claim and that there was no mutual mistake or oversight between appellee and the representative of appellant company, and further that there was not a sufficient showing of fraud or concealment of material facts such as would warrant the court in setting aside said settlement and compromise. We hold that there was a valid compromise and settlement of the appellee's claim and that the appellee did not meet the burden imposed upon him of setting aside such release and that the court was in error in so holding.

This holding renders it unnecessary for us to pass upon other questions argued, including the action of the trial court in upholding the merits of the claim as set forth by appellee.

Appellee's motion to dismiss the appeal was considered and overruled.—Reversed.

MULRONEY, C. J., and HALE, SMITH, OLIVER, WENNERSTRUM, and MILLER, JJ., concur.